IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

Paul Lane,
                            :

     Plaintiff,               :        Case No. 2:11-cv-0966

                            :

v.

                            :        Magistrate Judge Kemp

City of Pickerington, et al.,
                            :

     Defendants.

<u>OPINION AND ORDER</u>

This matter is before the Court on two motions in limine filed by defendants the City of Pickerington Personnel Appeals Board and the City of Pickerington.  Specifically, currently before the Court for consideration are the defendants' motion in limine to exclude evidence of economic damages (Doc. 66) and the defendants' "motion in limine concerning additional pre-deprivation claim" (Doc. 71).  The latter motion relates to whether plaintiff Paul Lane is entitled "to raise an additional claim for an alleged violation of his procedural Due Process rights based on the alleged charges of sexual harassment." (Doc. 71 at 1).  Also before the Court is Mr. Lane's motion for an oral argument pursuant to Local Rule 7.1(b) or, in the alternative, motion for leave to file a sur-reply.  (Doc. 76).  For the reasons set forth below, the defendants' motion in limine to exclude evidence of economic damages will be granted in part and denied in part (Doc. 66), and the defendants' "motion in limine concerning additional pre-deprivation claim" will be denied (Doc. 71).  Mr. Lane's motion for an oral argument pursuant to Local Rule 7.1(b) or, in the alternative, motion for leave to file a sur-reply will be granted.  (Doc. 76).  More specifically, the motion will be granted to the extent that Mr. Lane seeks leave to file a sur-reply, and the arguments raised in the motion will constitute his sur-reply and will be considered by this Court in

ruling on the pending motions.

## I. Background

On October 28, 2011, plaintiff Paul Lane filed a complaint in this case against defendants the City of Pickerington Personnel Appeals Board, the City of Pickerington, Mayor Mitch O'Brien, former interim city manager Michael D. Taylor, and former personnel director Linda Fersch seeking compensatory damages and equitable relief under 42 U.S.C. §1983, the Constitution of the United States, the Ohio Constitution, Article II, Section 34 and Article XV, Section 10, and the common law of the State of Ohio.  (Doc. 2 at 2).  In a decision issued on August 20, 2013, Magistrate Judge Abel, the Magistrate Judge originally assigned to this case, summarized that complaint as follows:

> This lawsuit arises out of Pickerington firing Paul Lane in November 2009 from his job as an inspection administrator for having pornographic images on his work computer.  The complaint pleads that defendants knew the charge was supported by false or insufficient information to justify termination of Lane's employment.  It also pleads that defendants terminated Lane's employment in retaliation for his association with and support of former City Manager Timothy Hansley, who was fired just days before Lane.  Lane sought a post-termination hearing before the Pickerington Personnel Appeals Board ("PAB"), but Pickerington denied the request, maintaining that he was an unclassified director level employee.  Following lengthy litigation, the PAB determined that Lane was classified employee, heard his appeal, and reduced his termination to a 30-day suspension.

> The complaint pleads claims for unlawful retaliation for protected speech, failing to provide post-deprivation due process, and defamation.

(Doc. 51 at 1-2)(footnotes omitted).  Magistrate Judge Abel further noted that Mr. Lane withdrew his retaliation claim and defamation claims against defendants Linda Fersch and Mitch O'Brien, but Mr. Lane continued to assert defamation claims

2

against defendants Taylor and the City of Pickerington.  Id. at 2.

Before the Court on August 20, 2013 was a motion for summary judgment filed by the Pickerington Personnel Appeals Board and the City of Pickerington, a motion for summary judgment filed by individual defendants Mitch O'Brien, Michael D. Taylor, and Linda Fersch, and a motion for partial summary judgment filed by Mr. Lane.  In resolving the motions, Magistrate Judge Abel first determined that Mr. Lane "received all the process to which he was entitled." (Doc. 51 at 32).  Consequently, Magistrate Judge Abel granted summary judgment to Defendants on Mr. Lane's claim based on violations of his procedural due process rights.  Magistrate Judge Abel likewise granted summary judgment to Defendants on Mr. Lane's defamation claim.

Mr. Lane appealed Magistrate Judge Abel's decision to the Court of Appeals.  On November 14, 2014, the Court of Appeals issued an opinion and order affirming in part, reversing in part, and remanding the case for proceedings.  The Court of Appeals referred to the following relevant facts from Magistrate Judge Abel's decision:

> On August 30, 1999, Paul Lane began working for Pickerington as a construction inspection supervisor.  In 2002, he was demoted to construction inspector. Beginning informally in November 2004 and officially in November 2005, Lane was an inspection administrator.
>
> City manager Tim Hansley was Lane's boss.  Although Lane would call Hansley a friend, they did not see each other often outside the work environment.  Hansley was fired October 20, 2009.  Shortly before he was fired, Hansley met with Lane and four other employees and told them that the mayor, Mitch O'Brien, wanted him to fire them.  Lane believes that Hansley was fired because he refused to fire them.  Defendant Linda Fersch, Pickerington's personnel director, told the five not to worry, there were always rumors.  Lane testified that Hansley was a good city manager and should not have been fired.

3

On October 22, 2009, police chief Michael Taylor's first day as acting city manager, he told Eric Vannatta to search Lane's computer. Taylor testified that he ordered Lane's computer searched because "there was a rumor that certain city employees Lane, Steve Carr, and George Parsley were removing erasing [sic] public documents from their computers." He could not recall who he heard the rumor from. He testified, "The rumor was Tim Hansley was saying these people ... were removing public documents from their computers."

Vannatta suffered a stroke in 2010 that has eliminated his memory of many events over the 25 years before the stroke. He has little recollection of the search. He does not remember what he was searching for or how he used Recuva software during the search. He does recall burning a copy of the pornographic images found on the computer to a CD. Almost all the images were from June 27 and 30, 2005, some four and one-half years before the search. Vannatta wrote a one-sentence October 23, 2009 memo to Taylor: "After using specialized software to retrieve images from Paul Lane's computer, it was noted that pornographic images were present on the hard drive."

Several weeks later, Vannatta used Recuva software to inspect George Parsley's computer. Lane and Parsley's computers were the only two computers Vannatta ever inspected during his career with Pickerington.

Taylor testified that Vannatta told him he found no evidence any public documents were being erased from the searched computers. But Vannatta said he found around 30 pornographic images and "he found numerous sites where--numerous listings on the computer where Paul went to look at pornography." Taylor further testified that Vannatta said there was a device on the computer that meant that what Lane was doing on the computer didn't get stored on the hard drive.

City policy prohibits viewing pornography on city computers. The city's internet guidelines prohibit using a computer to view pornographic, obscene, and sexually oriented images.

At approximately 8:20 a.m. on October 29, 2009, Taylor gave Lane a predisciplinary notice of an October 30 predisciplinary hearing. Lane was not told that he

might be terminated or that he had the right to be represented by an attorney at the hearing.

Taylor held the predisciplinary hearing which began at 10:00 a.m. on October 30, 2009. Personnel director Fersch was present, but did not participate. Taylor asked Lane to explain the pornography found on his computer. Lane asked to see the images found on his computer, and Taylor refused to show them to him. Lane testified that he told Taylor that he did not put pornography on the computer. He further told Taylor that "if there are any images, the only way I am aware there could be any would be from checking my personal email. You open something from a buddy and it's an off color joke and a picture of boobs.... I'm not aware of ever opening up any emails on my work computer." Although his computer was password protected for login, Lane testified that anyone could access his computer during the work day because he was often out of his office and his computer was on from 6:00-6:30 a.m. to 5:00-6:00 p.m.

During the hearing, Taylor told Lane he had the option of resigning or being fired. Lane testified that Taylor him that he could resign and receive a good recommendation. Lane asked to consider the offer over the weekend. On Monday, Lane told Taylor he would not resign. Taylor testified that he alone made the decision to fire Lane for looking at pornography on a work computer.

On October 30, 2009, probably after the prediciplinary hearing, Taylor asked the Sgt. Gene Delp to witness Eric Vannatta examine Lane's computer. Vannatta ran a program to search for deleted files and printed out a list of those files. Vannatta told Delp he was looking for pornography. Delp's recollection was that Vannatta found some cookies from pornography sites and history of internet visits to those sites. However, he did not include those findings in his report to Taylor, and that type of finding should have been included in the report. Vannatta found U2 software on Lane's computer, which could have been used to run a web browser and other software without using the computer's hard drive. A Google Chrome browser was also installed on the computer. That browser would permit the user to browse the internet anonymously without creating any entries on the internet history file.

Delp reported to Taylor that Vannatta found pornographic images that appeared to come from pornographic websites. Taylor told him to write a summary report. Delp wrote a report either that day or the next. That report reads, in relevant part:

> Eric Vannatta provided computer tools which would recover deleted files, and showed me how he had used this software to recover appx. 30 files which indicated the computer had been used to access pornography over the internet. The files were still in the computer's hard drive, and were again located by the software provided by Eric Vannatta among 42,000 images which had been deleted from the computer. The pornography files were located in the Internet Explorer 5 temporary files and dated in 2005. The location of the files is consistent with files stored during the use of Internet Explorer. This is contrary to the claim from Mr. Lane that the files were delivered to his computer in an email. The history of Internet Explorer was set to save the internet browsing history for 999 days; however the only history on the computer was from seven days prior to his pre-disciplinary meeting with Chief Taylor. I would conclude that Mr. Lane had cleaned the computer prior to examination by Eric and me.
>
> I also discovered that "U-3" software had been installed on the computer. This software is included on some thumb drives and allows for applications to be run directly from the thumb drive. These applications can include internet browsers, on-line chatting software, video players, etc. and can access the internet without leaving any trace on the computer hard drive. Mr. Lane also had Google Chrome installed on his computer. This program is an internet browser capable of running in "Incognito Mode." This mode allows the user to browse the internet without saving any history or temporary files to the computer's hard drive.

On November 5, 2009, Lane picked up from personnel director Fresch a letter terminating his employment. Lane believes he may have been fired because he was perceived to be "too close to Tim" Hansley. Plaintiff has proffered no evidence supporting that speculation.

6

On November 2, 2009, Taylor issued a letter terminating Lane that was [allegedly] based on false and/or misleading statements made by Fersch and others. On November 17, 2009, Lane submitted a request for hearing before the Personnel Appeals Board. Defendants notified plaintiff that he was not a classified employee and that the PAB did not have jurisdiction over his appeal. Lane was [allegedly] denied his right to due process because defendants failed to comply with Section 9.03 of Pickerington City Ordinances. Defendants [allegedly] violated their clear duty to provide Lane with post-deprivation due process to conduct a hearing and to issue a determination on the merits of his appeal.

....

Lane testified that he was defamed by a newspaper article that said he admitted possession of pornography and because "[he] was on 10TV."

On December 4, 2009, Taylor wrote a letter to the Ohio Bureau of Unemployment Compensation in response to a question asking for "additional information you might have significant to the separation." The letter stated, in relevant part:

When Paul's computer was checked, it was determined that there was 40,000 "hits" on the computer where he went to the Internet looking at various things and approximately 30 pictures were pornographic. When questioned, Paul admitted to looking at the pictures but stated that he was just checking his home E-mail at work, and when he opened the mail, it was determined to be pornographic. (30 different times?) If so, why not erase from the computer once determined? Also, he was using different software to access the sites (to avoid a record on the hard drive), which was not authorized. It was determined later this was not accurate, as the site had to be directly accessed, see enclosed print out of the internet site and photo.

Additionally, in regards to sexual harassment with other employees. He made comments alleged about masturbation to a female employee, made an alleged sexual comment to another employee her breasts [sic], and was allegedly changing pants in

his office with the door opened and was witnessed by yet another female, and his comment was it was ok, I have boxer shorts on.

Paul also made for somewhat of an uncomfortable, non-conducive work atmosphere. He allegedly would change into exercise clothes while at work, he pushed open the bathroom door of the men's room to witness other men going to the restroom. He allegedly invaded the female employees' personal space by walking right up to them or walking up behind them.

I interviewed several different employees and received the same comments about Paul Lane. He would leave the office, stay gone for hours at a time, not come in until late and not advise anyone. It was difficult to schedule appointments, as the secretary would not know where he was or when he would be in many times. I also determined no one really knew what he did for a job. I questioned 5-6 people and they couldn't advise what he really did. Although he was the "Building Administrator" he did very few if any administrative duties.

As for prior discipline, he received none due to the two past city managers would not administer discipline. Numerous complaints were taken to the two previous city managers and no action was taken, not even any documents in his file.

Upon initial complaints about Paul, I found them to be sustained. The female workers were on edge, and felt very uncomfortable working with him. One female employee was so concerned, she felt she should go outside and around the building through the back door to the restroom to avoid walking past his office.

After talking to numerous people, I determined there was a atmosphere created by Paul that was non conducive to a good working environment. Changing clothes in an office that was witnessed by female employees, making sexual comments to a female employee, invading personal space, making comments about a female's breasts to her, all this hardly constitutes a health [sic] work environment. I consider the city fortunate a sexual harassment

8

> suit was not imposed by the female workers of the city due to lack of action on two prior city managers' actions.

(Doc. 54 at 2-6) (footnotes omitted).

The Court of Appeals added the following regarding the procedural history of the case:

> The Notice of Predisciplinary Conference states that the alleged offense was "Violation of Technology, Section 2; unacceptable and personal use," and the summary of charges states "Prohibited use of the internet for viewing and retaining pornographic materials on city computer. Misuse of city property in an inappropriate and offensive manner."

> On December 1, 2009, Phillip Hartmann, the Law Director of the City of Pickerington, responded to Lane's request for a hearing before the Personnel Appeals Board with a letter stating that Lane was an unclassified employee and the Personnel Appeals Board had no jurisdiction to hear his appeal. In 2010, Lane filed a writ of mandamus with the Ohio Fifth District Court of Appeals demanding that Defendants be ordered to issue a determination on Lane's request for a hearing and a final appealable order. It was denied. On October 27, 2011, the Ohio Supreme Court ruled that the letter issued by the City of Pickerington Law Director did not provide an adequate remedy at law for Lane because the letter was not a final, appealable order from or on behalf of the City of Pickerington Personnel Appeals Board. On January 27, 2012, the Fifth District Court of Appeals issued a mandamus directing the Personnel Appeals to issue a determination on Lane's request for a hearing. The City's Personnel Appeals Board conducted a hearing to determine whether Lane was a classified employee at the time of his termination on May 10, 2012. On May 29, 2012, the Board determined that the City failed to demonstrate that Lane was unclassified. On November 29, 2012, Lane was given a hearing before the Board on the merits of his termination. The Board upheld the finding of a violation of city policy, reversed the decision to terminate Lane's employment, modified the termination to a 30-day suspension, and ordered that Lane be reinstated to a non-supervisory position for which he was otherwise qualified. The Board's order is currently on appeal to the Fairfield County Court of Common Pleas.

      The district court granted summary judgment in favor of the City of Pickerington and the Individual Defendants.

Id. at 6-7 (footnotes omitted).

In reviewing the Judge Abel's decision to grant summary judgment, the Court of Appeals first disagreed with Judge Abel's finding that Mr. Lane failed to plead pre-deprivation due process allegations in the complaint.  Stated differently, the Court of Appeals disagreed with Judge Abel's finding that Mr. Lane's complaint contained only facts related to post-deprivation due process.  Consequently, the Court of Appeals considered both Mr. Lane's pre-deprivation due process claim, as well as his post-deprivation claim.  The Court of Appeals next found no dispute that Mr. Lane had a property interest in his job.  Thus, the Court of Appeals focused its inquiry on what process was due.

In examining Mr. Lane's pre-deprivation claim, the Court of Appeals found that Mr. Lane was not provided with a constitutionally adequate pre-termination hearing.  As to Mr. Lane's assertion that his post-deprivation hearing violated due process because it was untimely, the Court of Appeals found that the process Mr. Lane received was not just delayed, "it was ongoing."  (Doc. 54 at 15).  Thus, the Court of Appeals agreed with Judge Abel that "the delay in receiving a post-termination hearing in this case did not violate Lane's constitutional rights."  Id.

Turning to the City of Pickerington, the Court of Appeals observed that, because Judge Abel found no constitutional violation, his decision did not reach the issue of whether respondeat superior precludes municipal liability for the City of Pickerington in this case.  In examining this issue, the Court of Appeals first noted that, under Monell v. New York City Department of Social Services, 436 U.S. 658 (1978), a

municipality may be liable for the acts of its employee under 42 U.S.C. §1983 where the "acts may be fairly said to represent official policy." (Doc. 54 at 15), quoting <u>Monell</u>, 436 U.S. at 694. Based upon this principle, the Court of Appeals concluded that summary judgment based on <u>Monell</u> is "inappropriate" in this case because "Taylor, the City Manager, appears to have been the final decision maker when dealing with city employees." <u>Id</u>.

The Court of Appeals next turned to the argument raised by individual defendants O'Brien, Taylor, and Fersch that they are entitled to qualified immunity, "which protects government officials performing discretionary functions from civil liability under §1983 unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Id</u>. at 16, quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982). The Court of Appeals stated:

> Their sole argument is that they infringed no clearly established right because no reasonable official would have known that terminating Lane, after notice, for viewing pornography was impermissible. This argument conflates the clearly established procedural right at issue with the reason for the termination, and ignores the patent inadequacy of the notice. Although the Constitution does not require an 'elaborate' pre-deprivation hearing, it required Defendants to provide Lane "a meaningful opportunity to tell his side of the story" before he was fired. <u>Loudermill</u>, 470 U.S. at 545-46. A reasonable official would have known that Lane was entitled to view the evidence against him. Additionally, a jury could find that Lane was terminated based on allegations not contained in the notice of the pre-disciplinary conference; a reasonable official would thus have known the notice was constitutionally inadequate.

<u>Id</u>. Based on the foregoing, the Court of Appeals did not find that the individual defendants are entitled to dismissal based on qualified immunity.

Finally, the Court of Appeals determined that Mr. Lane failed to allege a sufficient defamation claim under Ohio law.

The Court of Appeals found that Magistrate Judge Abel correctly determined that the only defamation allegation pleaded in the complaint was based on false and misleading information in Chief Taylor's letter terminating Mr. Lane's employment.  The Court of Appeals noted that, even assuming that other allegedly defamatory statements made by Chief Taylor were properly before it, the defamation "claim is barred by qualified privilege." Id. at 16. The Court of Appeals explained that qualified privilege may be overcome only if the claimant proves that the publisher acted with "actual malice," which it defined as "acting with knowledge that the statements are false or acting with reckless disregard as to their truth or falsity." Id. at 17.  In this case, the Court of Appeals found that Mr. Lane failed to demonstrate that Chief Taylor's statements were false or made with reckless disregard of their falsity.  The Court of Appeals stated:

> First, Taylor's statement that Lane admitted to looking at pornography on city computers was substantiated by Lane's deposition testimony that "if there are any images, the only way I am aware that there could be any would be from checking my personal email. You open up something from a buddy and it's an off-color joke and a picture of boobs . . . . I'm not aware of ever opening up any emails on my work computer."  In an investigation summary from Sgt. Matt Delp and in a memorandum from Eric Vannatta, who were charged with searching Lane's computer, the material on Lane's computer was described as pornographic, and there is no dispute that there were approximately thirty pictures on Lane's computer that Taylor viewed as pornographic. Moreover, the search of Lane's computer revealed that the "pornographic" images on the hard drive had been accessed by going to a website, not via email, and that software had been installed on the computer to allow Internet browsing without leaving any trace on the computer hard drive.
>
> Taylor's statement that Lane created a hostile working environment was substantiated by Lane's own testimony, admitting that he participated in conversations about naming women's breasts and telling a

12

masturbation joke, and that he told a woman wearing a sheer blouse that he could see her nipples. Further, Taylor received four statements from female employees complaining of sexual harassment by Lane. Among these was a statement from a woman saying that she observed a copy of a Playboy article on sex and sexuality left on the copier that was later picked up by Lane. Taylor testified that this is what he was referring to when he stated that Lane's viewing of pornography created a hostile work environment.

Finally, the district court correctly noted that a newspaper article written by Nate Ellis states: "Taylor declined to elaborate on the alleged material but disagreed with Lane's assertions," and only attributes one statement to Taylor: "Clearly, it was pornographic." Lane has failed to show that Taylor made the allegedly defamatory statements with "a high degree of awareness of their probable falsity" or entertained serious doubts as to the truth of his publication.

Id. at 17-18. Thus, the Court of Appeals determined that the qualified privilege applies.

Based on the foregoing, the Court of Appeals affirmed Judge Abel's grant of summary judgment to defendants on Mr. Lane's post-deprivation due process claim and Ohio defamation claim. However, the Court of Appeals reversed Judge Abel's award of summary judgment to defendants on Mr. Lane's pre-termination due process claim and remanded the case for further proceedings consistent with its opinion.

On February 9, 2015, Magistrate Judge Abel held a telephone conference in this case. After that conference, Magistrate Judge Abel issued an order stating, inter alia, that "Plaintiff reads the Court of Appeals' decision as holding he was denied pre-termination due process. Defendants believe that even if that is so, there are significant legal issues regarding remedies and fact issues regarding damages." (Doc. 56 at 1). In the order, Magistrate Judge Abel stated that he was leaving the bench on March 2 and, as such, noted counsel's request that "the new

magistrate judge assigned to the case meet with them to discuss these and other issues." Id. at 2.

On March 2, 2015, this case was reassigned to the undersigned Magistrate Judge for all further proceedings. (Doc. 59). Mr. Lane filed a motion to reassign the case to the District Judge upon the retirement of Magistrate Judge Abel (Doc. 57), but the District Judge denied Mr. Lane's motion (Doc. 65). Consequently, this action remains pending before the undersigned Magistrate Judge for decision.

On May 6, 2015, defendants the City of Pickerington and the Personnel Appeals Board filed a motion in limine to exclude evidence of economic damages. (Doc. 66). On May 19, 2015, individual defendants Ms. Ferch and Mr. O'Brien filed a motion for summary judgment. (Doc. 67). This Court held a status conference on May 19, 2015 and issued an Order regarding that conference the following day. In the Order, the Court noted that the defendants will file a second motion in limine dealing with whether Mr. Lane would be permitted to present evidence of a second, separate pre-deprivation due process violation, involving issues of alleged sexual harassment of co-workers, to the jury, and whether the jury would be permitted to find a separate constitutional violation should the facts warrant it. The Court also stayed the briefing on the motion for summary judgment pending a ruling on the two motions in limine. The Court added that Mr. Lane may file a motion for summary judgment based on the Court of Appeals' decision, but stated that "no additional proceedings will occur until the Court has ruled on the two motions in limine and the parties have determined if that ruling provides as basis for settlement discussions." (Doc. 68 at 1). Mr. Lane filed a motion for summary judgment on May 26, 2015. (Doc. 69). Thereafter, the following were filed: a trial brief on remaining issues by Ms. Ferch, Mr. O'Brien, and Chief Taylor

14

(Doc. 70); a motion in limine regarding damages and additional
deprivation claim by the City of Pickerington and the Personnel
Appeals Board (Doc. 71), a response in opposition to the motion
for summary filed by Ms. Ferch, Mr. O'Brien, and Chief Taylor
(Doc. 72), a response in opposition the motions in limine (Doc.
73), and a reply in support of Mr. Lane's motion for summary
judgment (Doc. 74).  Finally, Mr. Lane filed a motion for oral
argument or, in the alternative, leave to file a sur-reply to the
motions in limine.  (Doc. 76).  The Court now considers Mr.
Lane's motion for oral argument or, in the alternative, leave to
file a sur-reply and the motions in limine.

## II. <u>Discussion</u>

The Court first examines Mr. Lane's motion for oral argument
or, in the alternative, leave to file a sur-reply.  (Doc. 76).
Local Rule 7.2, which governs the submission of motions and other
papers, provides for the filing of opposing memoranda and
replies, but states that "[n]o additional memoranda  ... are
permitted except upon leave of court for good cause shown."  S.D.
Ohio Civ. R. 7.2(a)(2).  Although Mr. Lane does not attach a copy
of a proposed sur-reply to the motion, it appears that many of
his arguments are set forth in the body of the motion.  For good
cause shown, the Court will grant Mr. Lane's motion and will
consider the arguments raised therein as his sur-reply.  Thus,
the Court will consider the arguments raised by Mr. Lane in his
motion in addition to those contained in the other briefs filed.

In their motion in limine, the City of Pickerington and the
Personnel Appeals Board (the "City defendants") move this Court
for an order "excluding any evidence or testimony at trial
regarding plaintiff's alleged economic damages, specifically his
lost wages, potential front pay, attorney's fees in the related
suits, and limiting testimony or evidence related to alleged
costs and prejudgment interest."  (Doc. 66 at 1).  The Court

first examines the argument that Mr. Lane is not entitled to
recover lost wages in this lawsuit.

A. <u>Lost Wages</u>

There is considerable briefing by the parties pertaining to
whether, or the extent to which, Mr. Lane may recover lost wages
based upon a procedural due process violation.  More
specifically, the following issues are raised and argued in the
briefs filed by the parties:  (1) whether the applicable law
allows for lost wages in these circumstances; (2) whether an
award of lost wages would result in Mr. Lane receiving double
recovery or is barred by <u>res judicata</u> or the <u>Rooker-Feldman</u>
doctrine; and (3) how an award of lost wages should be
calculated.  The Court examines these issues in turn.

1. <u>Whether The Applicable Law Allows For Lost Wages
In These Circumstances</u>

In their motion, the City defendants assert that the
relevant law does not allow Mr. Lane to recover lost wages "if
the allegations [against him] are true, and permits only damages
traceable to the denial of the [pre-disciplinary] hearing."
(Doc. 66 at 3).  The City defendants assert that, although the
Personnel Appeals Board imposed an alternate form of discipline
on Mr. Lane after the post-disciplinary hearing – by modifying
his termination to a 30-day suspension without pay and demoting
him to a non-supervisory position – it nonetheless "found that
Plaintiff engaged in the behavior of which he was accused and for
which he was terminated."  <u>Id</u>. at 4.  The City defendants argue
that, because the allegations against Mr. Lane "were ... found to
be true by a neutral fact finder," Mr. Lane is barred from
recovering lost wages based on the lack of an adequate pre-
disciplinary hearing.  <u>Id</u>.

Mr. O'Brien, Chief Taylor, and Ms. Fersch filed a separate
brief, in which they "adopt and wholly incorporate the motion in

16

limine" filed by the City defendants.  (Doc. 70 at 3).  Like the
City defendants, the individual defendants also argue that Mr.
Lane is only entitled to nominal damages caused by the pre-
deprivation due process violation.  More specifically, the
individual defendants contend that those damages should not
"exceed one dollar."  Id. at 4.

Mr. Lane argues that, contrary to the arguments set forth by
the defendants, the post-disciplinary hearing demonstrated that
the deprivation of his rights was unjustified.  Using a graphic
illustration, Mr. Lane asserts that, if there was a pre-
termination due process violation and the decision to terminate
him was not justified on the merits, he is entitled to economic
damages.  In other words, Mr. Lane argues that, because a
"[c]onstitutional violation caused the job loss ... [he] is
entitled to lost wages as part of his actual damages."  Id.
Thus, Mr. Lane argues that the defendants are incorrect in their
assertion that he is unable to recover lost wages based on his
Fourteenth Amendment procedural due process claim.

The parties generally agree on the law applicable to Mr.
Lane's procedural due process claim.  As an initial matter, Mr.
Lane is allowed to recover nominal damages for a violation of his
right to procedural due process, even if he is unable to
demonstrate an actual injury.  See Carey v. Piphus, 435 U.S. 247
(1978).  Because Mr. Lane seeks more than nominal damages, he
must show the existence of an actual injury directly caused by
the violation of his procedural due process rights.  See
Wedgewood Ltd. Partnership I v. Township of Liberty, Ohio, 2010
WL 4861434 (S.D. Ohio Nov. 16, 2010), citing Carey, 435 U.S. at
262 and Kendall v. Board of Education, 627 F.2d 1, 6 (6th Cir.
1980), implicitly overruled on other grounds by Duchesne v.
Williams, 849 F.2d 1004 (6th Cir. 1988)(en banc).  Actual injury
caused by the violation of Mr. Lane's procedural due process

17

rights is demonstrated as follows: once Mr. Lane establishes the constitutional deprivation, the burden the shifts to the defendants to demonstrate that the deprivation of his constitutional rights did not cause the injury. <u>Kendall</u>, 627 F.2d at n.6, citing <u>Mt. Healthy City School Dist. Bd. of Educ. v. Doyle</u>, 429 U.S. 274, 287, 97 S. Ct. 568, 576, 50 L. Ed.2d 471 (1977). To satisfy this burden, the defendants must show that there was just cause for the action taken against Mr. Lane, that is, that the charges against him were true. <u>Id</u>.

The parties disagree as to whether the defendants' burden may be satisfied where, as here, Mr. Lane was subject to a sanction less severe than termination of his employment after he was afforded a hearing. Simply stated, the defendants maintain that this Court's inquiry should focus on whether it was proper to impose *any* discipline on Mr. Lane. They argue that, because some form of punishment was found to be proper – albeit a punishment less severe than the termination originally imposed – the allegations against Mr. Lane were found to be true. Based upon their position that the allegations against Mr. Lane were found to be true, the defendants argue that Mr. Lane's recovery must be limited to nominal damages. Conversely, Mr. Lane's arguments suggest that, instead of focusing on whether any discipline was found to be proper, the Court's inquiry should be focused on whether the *result would have been the same* if Mr. Lane had been afforded procedural due process.

Mr. Lane's position is supported by the relevant law. In <u>Kendall v. Board of Education</u>, 627 F.2d 1, n.6 (6th Cir. 1980), the Court of Appeals found that, to meet its burden, the Board of Education was required to show that it had just cause for the plaintiff's dismissal, that is, that its charges against her were true. <u>Id</u>. at n.6. Thus, as Mr. Lane suggests, this Court is charged with examining whether the defendants had just cause for

18

*the punishment which was actually imposed* upon him without due process – not whether *any punishment* should have been imposed. As the Court of Appeals explained in <u>Franklin v. Aycock</u>, 795 F.2d 1253, 1263 (6th Cir. 1986), in order to resolve the issue of causation, the Court should examine "whether the action taken without due process is justified or, in other words, whether *the same action would have been taken* even if due process has been afforded." <u>Id</u>. (emphasis added), citing <u>Carey</u>, 435 U.S. at 260. Decisions outside of the Sixth Circuit have also found that defendants satisfy their burden of proof if they are able to demonstrate that the *same result* would have been reached absent the due process violation. <u>Brewer v. Chauvin</u>, 938 F.2d 860, 864 (8th Cir. 1991) (damages caused by the due process violation will only include back pay "when there is a finding that the discharge would not have occurred if the employee's procedural due process rights had been observed"); <u>Wheeler v. Mental Health and Mental Retardation Auth.</u>, 752 F.2d 1063, 1071 (5th Cir. 1985)("back pay is not recoverable when the employer can show that the discharge would still have occurred absent procedural defects"); <u>Soto v. Lord</u>, 693 F. Supp. 9, 21 (S.D.N.Y. 1988)("The defendant can meet this burden by proving the same result would have been reached absent the due process violation"). Stated another way, if the termination was unjustified, then damages may include an award for lost wages. <u>See, e.g., Nalls v. Board of Trustees of Illinois Cmty. College Dist. No. 508 d/b/a City Colleges of Chicago</u>, 2007 WL 1031155, at *5 (N.D. Ill. Mar. 29, 2007)("If the termination was not justified, plaintiff's damages may include the consequences of the termination, such as lost pay").

As set forth above, when the Personnel Appeals Board conducted the post-termination hearing, it found that a different form of discipline – not termination of Mr. Lane's employment – was justified. Thus, the defendants are unable to satisfy their

burden of proving that the result would have been the same if due process had been afforded.  Under these facts, the Personnel Appeals Board found that the termination was unjustified.  Consequently, the applicable law allows for lost wages in these circumstances.

### 2. Whether An Award of Lost Wages Would Improperly Result In Double Recovery Or Is Barred By Res Judicata Or The Rooker-Feldman Doctrine

The defendants also argue that permitting the recovery of lost wages in this lawsuit would award Mr. Lane "double damages." The defendants explain that, once Mr. Lane was reinstated to his position, Ohio law required the City of Pickerington to pay him "for the period of time during which he was illegally excluded from his position." (Doc. 66 at 5), quoting Monaghan v. Richley, 32 Ohio St.2d 190, 194 (1972).  The defendants assert that, because the City of Pickerington calculated the wages it owed to Mr. Lane and tendered payment to him, any award of lost wages would constitute "double damages."  According to the defendants "[t]he logic behind the doctrine of res judicata, and to some extent, the Rooker-Feldman doctrine, prohibit Lane from challenging the state court decision in this Court." (Doc. 70 at 5).

In opposition, Mr. Lane claims that the City of Pickerington has not tendered lost wages to him. He also argues that the lost wages due to him under Ohio law are separate and distinct from those owed to him for the violation of his procedural due process rights.  Mr. Lane acknowledges, however, that to the extent that he receives lost wages under Ohio law, the Ohio law award should offset his federal award to avoid double recovery.  Finally, Mr. Lane argues that both res judicata and Rooker-Feldman are inapplicable to this case.

This Court agrees with Mr. Lane.  Although the law is clear that a plaintiff may not be awarded double recovery, see Hudson

20

v. Insteel Indus., Inc., 2001 WL 210586, at *8 (6th Cir. Feb. 23, 2001), citing General Tel. Co., Inc. v. EEOC, 446 U.S. 318, 332 (1980), Mr. Lane's Ohio law claim for lost wages is not currently before the Court.  Further, the defendants have not provided this Court with any evidence that Mr. Lane has received payment for the lost wages at issue.  To the contrary, Mr. Lane disputes the defendants' contention that they have tendered payment to him for lost wages.  Mr. Lane's position is supported by the defendants' reply brief, in which they state that Mr. Lane's counsel refused to accept the payment for lost wages.  If and when the occasion arises that Mr. Lane receives payment for lost wages under Ohio law, he has agreed that the federal law award will need to be offset in order to avoid double recovery.

Mr. Lane is also correct in his position that neither res judicata nor the Rooker-Feldman doctrine bar his claim for lost wages in this case.  In its traditional form, "[t]he doctrine of res judicata or claim preclusion states that a final and valid judgment on the merits of a claim precludes subsequent action on that claim."  Knox County Educ. Ass'n v. Knox County Bd. of Educ., 158 F.3d 361, 376 (6th Cir. 1998).  There are generally four prerequisites to applying the doctrine: that there has been a final decision on the merits rendered by a court of competent jurisdiction, that the second action involves the same parties as the first, that the issue in the second action is the same as the first, and that the causes of action are the same.  See Kane v. Magna Mixer Co., 71 F.3d 555, 560 (6th Cir. 1995).  "When the conditions for res judicata are satisfied, the claim is barred and no relief can be granted."  Evans v. Franklin County Court of Common Pleas, 184 F. Supp.2d 707, 712 (S.D. Ohio 2001).  Applied here, the defendants have not shown that there has been a final decision on the merits concerning Mr. Lane's claim for lost wages due to the violation of his procedural due process rights.  Thus,

21

res judicata does not bar Mr. Lane's claim for lost wages in this
Court.

Similarly, the Rooker-Feldman doctrine does not bar Mr.
Lane's claim for lost wages.  See District of Columbia Court of
Appeals v. Feldman, 460 U.S. 462, 103 S. Ct. 1303, 75 L. Ed.2d
206 (1983); Rooker v. Fidelity Trust Co., 263 U.S. 413, 44 S. Ct.
149, 68 L. Ed. 362 (1923).  That doctrine, explained simply, is
that federal district courts do not function as appellate courts
to review and correct errors occurring during the course of state
court proceedings.  As the Court of Appeals has explained, "[t]he
inquiry [under Rooker-Feldman] ... is the source of the injury
the plaintiff alleges in the federal complaint.  If the source of
the injury is the state court decision, then the Rooker-Feldman
doctrine would prevent the district court from asserting
jurisdiction."  McCormick v. Braverman, 451 F.3d 382, 292 (6th
Cir. 2006).  Here, the source of the injury alleged is not a
state court decision.  Indeed, there does not appear to have been
any state court determination regarding the propriety of a lost
wages award for the violation of Mr. Lane's procedural due
process rights.  Thus, Mr. Lane does not any allege that a state
court determination in error.  To the contrary, Mr. Lane contends
that the state court decisions were properly decided.
Consequently, the Rooker-Feldman doctrine does not bar this
Court's jurisdiction to hear Mr. Lane's claim for lost wages.

3. How An Award Of Lost Wages Should Be Calculated

The parties raise the following issues pertaining to how an
award of lost wages should be calculated: (1) whether an award of
lost wages should be based on the salary Mr. Lane earned before
he was terminated or on the salary he would have earned following
his demotion to the non-supervisory position; (2) whether an
award of lost wages should be reduced based on unemployment
benefits; and (3) whether the award of lost wages should be

calculated using the aggregate mitigation method or periodic
mitigation method.

### i. <u>Whether An Award Of Lost Wages Should Be Based On Mr. Lane's Original Salary Or The Salary Allocated To Him After His Demotion</u>

The defendants assert that, if this Court determines that Mr. Lane is entitled to an award of lost wages, that award should be based on the pay he would have received in the non-supervisory position following his demotion.  The defendants state that, after the post-deprivation hearing, Mr. Lane was offered the position of Parks Maintenance Worker I, which earned $19.17 per hour in 2010, $19.36 per hour in 2011, $19.65 per hour in 2012, and $20.04 per hour from 2013 through Mr. Lane's resignation on August 12, 2014.  The defendants maintain that these rates should be used to calculate Mr. Lane's lost wages because "[p]ermitting an award of back pay at the higher supervisory rate would result in a windfall to [him]...." (Doc. 66 at 6).  The defendants also contend that an award calculated using the supervisory rate would not "be traceable to the alleged violation of his constitutional right...."  <u>Id</u>.  To the contrary, Mr. Lane argues that the Court should use "his pre-termination salary for the time period between his termination and his merits hearing before the [Personnel Appeals Board], when he finally received due process." (Doc. 73 at 12-13).

Generally speaking, an award of lost wages is to restore the status quo that the employee would have enjoyed if a wrongful discharge had not occurred.  <u>See Medco Health Solutions of Columbus West, Ltd. v. Association of Managed Care Pharmacists</u>, 2011 WL 846878, at *1 (N.D. Ohio Mar. 8, 2011), citing <u>McCann Steek Co. v. NLRB</u>, 570 F.2d 652, 656 (6th Cir. 1978).  One court within this district looked to the Supreme Court's decision in <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 105 S. Ct. 1487, 84 L. Ed.2d 494 (1985) to resolve the issue of whether an employee who was discharged without due process was entitled to an award of back pay.  More specifically, the Court in

24

Irizarry v. Cleveland Public Library, 727 F. Supp. 357, 364 (N.D. Ohio 1989) noted that Loudermill requires public employers to "suspend an employee who posed a threat to the workplace, with pay, prior to the time that the pretermination hearing is held." Irizarry, 727 F. Supp. at 364 (emphasis in original), citing Loudermill, 470 U.S. at 544-45. Thus, the Irizarry Court determined that, pursuant to Loudermill, the proper remedy is to place the employee "in the position that the Constitution mandates he be in prior to a pretermination hearing — awaiting said hearing while receiving pay." Id. In that case, the Court found that the plaintiff was entitled to receive back pay running from the date that his employment was terminated until the resolution of a proper hearing. Id. In making that decision, the Irizarry Court also looked to Court of Appeals' decision in Duchesne v. Williams, No. 86-1017 (6th Cir, June 16, 1987), vacated on other grounds, 849 F.2d 1004 (6th Cir. 1988), which "found that ... remedial action was proper, including the award of back pay, so as to 'preserve the status quo until the new hearing could be held....'" Id., quoting Duchesne, No. 86-1017. Allowing "ancillary reinstatement and back pay" until a proper hearing is completed "maintains the status quo." DelSignore v. DiCenzo, 767 F. Supp. 423, 429 (D. Rhode Island 1991)(finding that, "[e]ven beyond the words of Loudermill, there are compelling policy reasons for this approach").

Applying that law to this case, the Court finds that the award of lost wages should operate to restore the status quo that Mr. Lane would have enjoyed had his employment not been terminated without a constitutionally adequate pre-termination hearing. Adopting the defendants' approach would effectively subject Mr. Lane to the demotion prior to a constitutionally adequate hearing, and it would place him in a different position than he would have been in prior to the improper termination.

25

Stated simply, applying the salary Mr. Lane would have received in the non-supervisory position would not preserve the status quo. Consequently, an award of lost wages should be based on the salary that Mr. Lane received prior to the termination of his employment.

      ii. <u>Whether An Award Of Lost Wages Should Be Reduced Based On Unemployment Benefits</u>

The defendants argue that Ohio law should apply to the calculation of Mr. Lane's lost wages. The defendants explain that Mr. Lane's unemployment compensation should be deducted from any back pay award in accordance with Ohio law. In opposition, Mr. Lane argues that his entitlement to lost wages arose as a result of the violation of his federal due process rights. Thus, Mr. Lane asserts that federal law, not state law, applies. Mr. Lane explains that unemployment compensation is not deducted from a lost wages award under federal law. Accordingly, Mr. Lane maintains that the defendants are incorrect in their assertion that his employment benefits should reduce the amount of his lost wages award.

Similar to their argument concerning "double damages," the defendants conflate two distinct claims – namely, an Ohio law claim for lost wages and a federal law claim for a violation of procedural due process. As noted previously, Mr. Lane has not asserted an Ohio law claim for lost wages in this Court. Thus, the defendants are incorrect in their assertion that "Mr. Lane's entitlement to wages is based on state law based on reinstatement by the Personnel Appeals Board." (Doc. 66 at 7). Hence, even if Ohio law requires reduction of a lost wages award by the amount of unemployment compensation that Mr. Lane received, that has no bearing on the federal law claim pending here.

In <u>Rasimas v. Michigan Dept. of Mental Health</u>, 714 F.2d 614, 627 (6th Cir. 1983), the Court of Appeals determined the

26

unemployment benefits are collateral benefits which should not be deducted from back pay awards. <u>Id</u>. "The collateral source rule is a substantive rule of law that bars a tortfeasor from reducing damages owed to a plaintiff by the amount of recovery the plaintiff receives from sources that are collateral to the tortfeasor." <u>Hamlin v. Charter Tp. of Flint</u>, 165 F.3d 426, 433 (6th Cir. 1999), quoting <u>Jackson v. City of Cookeville</u>, 31 F.3d 1354, 1359 (6th Cir. 1994). While a panel of the Court of Appeals deciding a case subsequent to <u>Rasimas</u> noted that, were the issue before it on a case of first impression, it may have decided the matter differently, that panel nonetheless found that it was bound by the <u>Rasimas</u> decision. <u>EEOC v. Kentucky State Police Dept.</u>, 80 F.3d 1086, 1100 (6th Cir. 1996). Thus, where an award of lost wages arises based on a federal law claim, that award is not reduced by the amount the plaintiff received in unemployment benefits. <u>See Knafel v. Pepsi-Cola Bottlers of Akron, Inc.</u>, 899 F.2d 1473, 1480 (6th Cir. 1990)(stating that unemployment benefits are collateral benefits not properly offset against an award of back pay); <u>see also Thurman v. Yellow Freight Systems, Inc.</u>, 90 F.3d 1160, 1170-71 (6th Cir. 1996) ("unemployment benefits are collateral benefits which the district court should disregard in making its award"). Applied here, Mr. Lane's lost wages award should not be reduced by the amount he received in unemployment compensation benefits.

    iii. <u>Whether The Lost Wages Award Should Be Calculated Using The Aggregate Mitigation Method Or The Periodic Mitigation Method</u>

The parties dispute whether the lost wages award should be calculated using the aggregate mitigation method or the periodic mitigation method. "[T]he aggregate mitigation method compares the wages plaintiff lost with [his] interim earnings over the entire recovery period." <u>Barnett v. PA Consulting Group</u>, 35 F. Supp.3d 11, 23 (D.C. Cir. 2014). Thus, the aggregate mitigation

method takes the gross amount that a plaintiff earned since his employment was terminated and subtracts the entire gross amount of lost wages accrued. If the plaintiff earned more in his new position, that excess is subtracted from the lost wages owed to him. Consequently, the aggregate mitigation method allows "earnings in mitigating employment in one period (a year) to reduce wages in other years." Godinet v. Management and Training Corp., 2003 WL 42505, at *5 (10th Cir. Jan. 7, 2003).

In contrast, the periodic mitigation method looks at shorter increments of time, such as a single year, and compares the amount earned in the plaintiff's new position during that year to the amount of lost wages during that year. If the plaintiff earned more during that year than he accrued in lost wages, then the lost wages award for that particular year is reduced by the excess earnings. Thus, any excess earnings which reduce the amount of lost wages owed in a given year do not reduce the amount of lost wages for any other year. Stated differently, "[u]nder the periodic mitigation method, if a plaintiff's interim earnings in any year exceeded the [lost] wages" owed to him, "that excess must not be deducted from any back pay for other years to which the plaintiff is entitled to relief." Barnett, 35 F. Supp.3d at 23. The difference between the aggregate mitigation method and the periodic mitigation method is demonstrated most clearly where, as here, a plaintiff was unemployed for some period of time after termination of his employment and subsequently finds a job more lucrative than his original position.

In this case, the defendants argue that the aggregate mitigation method should be applied, and Mr. Lane asserts that the periodic mitigation method should be applied. There is at least some support for Mr. Lane's position. In Skalka v. Fernald Environmental Restoration Management Corp., 178 F.3d 414 (6th

28

Cir. 1999), the defendant argued that the plaintiff's back pay award "should be reduced because several months after his termination, [the plaintiff] received a higher-paying position with another company." Id. at 426. Although the Court of Appeals noted that the plaintiff would not be entitled to lost wages for any period during which he earned a salary that was equal to or more than he would have received in his prior position, it stated that the "excess" earnings were not to be subtracted from the lost wages award accrued during his period of unemployment. Id.

One court observed that "the law is well-settled in favor of the periodic mitigation method." Schroer v. Billington, 2009 WL 1543686 (D.D.C. Apr. 28. 2009); see also Barnett, 35 F. Supp.3d at 24 ("this Court's research demonstrates that the Courts in this district routinely apply the period approach"). The validity of that method for calculating damages has been long-established, with the Supreme Court adopting it in NLRB v. Seven-Up Bottling Co. of Miami, Inc., 344 U.S. 344, 73 S. Ct. 287 (1953) (computation of back pay award under the National Labor Relations Act could be made on the basis of the employee's earning for segregated quarters, with deductions allowed for net earnings in other employment during that period). As the defendants point out, however, the use of the periodic mitigating method generally takes place in cases addressing the proper back pay award under the National Labor Relations Act ("NLRA") or Title VII.

Indeed, this Court is aware of just one decision applying the periodic mitigation method in the context of a §1983 claim based on a violation of procedural due process. In Kenrick v. Jefferson County Board of Education, 13 F.3d 1510 (11th Cir. 1994), the Court noted that it had "not discovered any cases" applying the periodic mitigation method "in the context of a

29

§1983 action...." Id. at 1513.  Despite this fact, the Court
applied a "quarterly earnings formula" on the ground that it
"more faithfully serves the remedial objectives of §1983." Id.
The Court added that the quarterly earnings formula would promote
a consistent application of back pay awards arising under the
NLRA, Title VII, and §1983.  The Court stated, "[w]e think this
consistency is valuable in itself, making the law more simple,
understandable, and predictable." Id.

   The Kenrick decision has not been adopted in the Sixth
Circuit and, as such, it is not binding upon this Court.
Moreover, as the Court in Kenrick acknowledged, "[t]he question
of which formula to use is not one to which there is clearly a
right or a wrong answer." Id.  In that case, the Eleventh
Circuit chose to decide the issue consistent with NLRA and Title
VII cases.  In making that decision, however, the Kenrick Court
failed to discuss the typical, and also well-established,
standard for calculating a back pay award under §1983.

   As the United States Supreme Court explained in Memphis
Community School District v. Stachura, 477 U.S. 299, 106 S. Ct.
2537 (1986), "42 U.S.C. §1983 creates a species of tort liability
in favor of persons who are deprived of rights, privileges, or
immunities secured to them by the Constitution." Id. at 305
(internal quotation and footnote omitted).  Thus, when a
plaintiff seeks damages for a violation of constitutional rights
under §1983, the amount of damages is typically determined under
principles from the common law of torts.  Such damages are
"designed to provide compensation for the injury caused to
plaintiff by defendant's breach of duty." Id.  The Supreme Court
explained that, although deterrence is a consideration, the
"basic purpose of §1983 damages is to compensate persons for
injuries that are caused by the deprivation of constitutional
rights." Id. (internal quotations omitted).

In this case, the defendants bear the burden of establishing that the back pay award should be decreased based upon the compensation Mr. Lane earned following the deprivation of his rights.  In practical terms, the mitigation duty involves a reduction from the claimed loss of wages from the employer against whom the plaintiff is seeking recovery.  Because the Sixth Circuit has yet to adopt the law or reasoning in Kenrick, the Court finds no basis upon which to deviate from the accepted calculation of such a damage award in this instance.  However, if Mr. Lane is seeking damages in the form of lost wages only for the period from his firing to the post-deprivation hearing, and if he did not earn wages during that period, the entire issue may be moot.

## B. Attorney's Fees

The Court now turns to the issue of attorney's fees.  The defendants acknowledge that, if Mr. Lane prevails on the procedural due process claim under 42 U.S.C. §1983, he would be entitled to an award of reasonable attorney's fees under 42 U.S.C. §1988.  The parties dispute, however, whether those attorney's fees would allow Mr. Lane to recover attorney's fees associated with the mandamus claim and the hearings before the Personnel Appeals Board.  The Court first examines whether attorney's fees associated with the mandamus claim are recoverable.  After doing so, the Court examines whether attorney's fees associated with the Personnel Appeals Board hearings are recoverable.

Mr. Lane asserts that attorney's fees associated with the mandamus action are recoverable for two reasons.  First, Mr. Lane argues that the attorney's fees are recoverable as fee-shifting under 42 U.S.C. §1988.  The parties agree that such attorney's fees are recoverable if they are "useful and of a type ordinarily necessary to advance the civil rights litigation."  See Binta B.

31

<u>Ex rel. S.A. v. Gordon</u>, 710 F.3d 608, 630 (6th Cir. 2013)
Magistrate Judge Abel stated the following with respect to the
mandamus action:

> Plaintiff alleges that he was denied access to the
> Personnel Appeals Board and his right to a post-
> termination hearing, but he had an adequate state law
> remedy for the alleged deprivation through a mandamus
> action. Plaintiff filed a mandamus action and, as a
> result of that action, plaintiff received a hearing in
> front of the Personnel Appeals Board. Because plaintiff
> had an adequate state law remedy for his alleged denial
> of post-deprivation due process, he cannot maintain a
> Section 1983 claim.

(Doc. 51 at 15). As noted above, the Court of Appeals affirmed
Magistrate Judge Abel's grant of summary judgment in favor of the
defendants on this issue.

As noted previously in this Opinion and Order, the ultimate
hearing on the merits conducted by the Personnel Appeals Board
has bearing on Mr. Lane's pre-deprivation due process claim in
this case. More specifically, because the Personnel Appeals
Board imposed a different form of discipline, which did not
terminate Mr. Lane's employment, it renders the defendants unable
to demonstrate that the same result would have been reached
absent the procedural due process violation. As this Court
recognized, this determination has a direct impact on Mr. Lane's
ability to receive more than nominal damages for his procedural
due process claim. That is, it permits him to show the existence
of an actual injury directly caused by the violation of his
procedural due process rights.

However, Mr. Lane was free to bring this lawsuit based on a
violation of his pre-deprivation due process rights without
pursuing a writ of mandamus in state court. Attorney's fees for
the mandamus action are not allowable simply because the ultimate
hearing on the merits has bearing on this case. Because a
mandamus action is not a type of action "ordinarily necessary" to

advance a §1983 claim, the Court finds that attorney's fees for
that action are not available under 42 U.S.C. §1988.  For the
same reasons, attorney's are also unavailable for attending
hearings before the Personnel Appeals Board.  While the
determinations made by the Personnel Appeals Board have some
bearing on this case, they are not the type or proceedings
"ordinarily necessary" to advance a §1983 claim.  Additionally,
the Court finds no merit in Mr. Lane's attempt to recover
attorney's fees for these proceedings as actual damages.

    C. <u>Costs, Pre-Judgment Interest, and Punitive Damages</u>

The defendants acknowledge that Mr. Lane has not given them
"any indication ... as to the scope of costs he intends to
requests, but only a statement that he intends to seek such
costs." (Doc. 75 at 11).  Despite these facts, the defendants
have requested that this Court determine the scope of costs
recoverable.  This Court declines to issue an advisory opinion on
the matter of costs.  The Court will address the matter of costs
once the issue is properly before it for resolution.

Similarly, pre-judgment interest is a post-trial matter not
properly resolved in a motion in limine.  Thus, the Court shall
consider the arguments made by the parties with respect to pre-
judgment interest when they are properly before it for
consideration.

Finally, the defendants argue that Mr. Lane is not entitled
to punitive damages.  Mr. Lane argues to the contrary.  Because
the arguments regarding punitive damages are not properly before
the Court at this juncture, this issue shall be determined by the
jury after a proper evidentiary hearing and based upon the
evidence presented at trial.

    D. <u>Alternate Theory Procedural Due Process Claim</u>

The second motion in limine filed by the City defendants
expressly adopts the portion of the individual defendants' trial

brief which argues that Mr. Lane is unable to bring and seek
damages for an additional claim for an alleged violation of his
procedural due process rights based on alleged charges of sexual
harassment.  This Court is unaware of anything in the procedural
history of this litigation which would foreclose Mr. Lane from
offering the additional claim for a violation of his procedural
due process rights.  Indeed, the Court of Appeals' decision
suggests that the alleged charges of sexual harassment may give
rise to an alternate theory of recovery.  In examining this
issue, the Court of Appeals determined the following:

> Lane was denied adequate pre-deprivation due process.
> Under Loudermill, a pre-deprivation hearing must include
> an explanation of the employer's evidence.  Lane was
> denied the opportunity to see the photographs he was
> accused of viewing and retaining, depriving him of a
> "meaningful opportunity to tell his side of the story."
> Loudermill, 470 U.S. 546.  Additionally, a jury could
> find that Lane was not given notice of all the charges
> against him.  Lane was notified that of the charge that
> he "viewed and retained" offensive images, but he was not
> yet notified of any sexual-harassment or hostile-work-
> environment charges, even though Taylor stated in a
> termination memorandum to the State of Ohio that Lane
> "created a hostile working environment that makes the
> women feel uneasy when Paul is present," and stated in a
> letter to the Ohio Bureau of Unemployment Compensation
> that, "in regards to sexual harassment," Lane made
> comments about masturbation to a female employee, made an
> alleged sexual comment to another employee about her
> breasts, was allegedly changing his pants in his office
> with the door open, and allegedly invaded female
> employees' personal spaces by walking right up to them or
> behind them.  The lack of notice and an opportunity to be
> heard is evident given that Taylor based his decision to
> terminate Lane in part on Lane's "failure to present any
> evidence to the contrary at the [pre-termination]
> hearing."

(Doc. 54 at 10-11) (alteration in original) (footnotes omitted).
Based on the foregoing, at this stage of the litigation, this
Court is unaware of any reason that Mr. Lane's second claim for a

violation of his procedural due process rights could not be
presented to the jury.  Consequently, this Court will not rule as
a matter of law that Mr. Lane is prohibited from bringing such a
claim, and the second motion in limine will be denied.

### III. <u>Conclusion</u>

For the reasons set forth above, the defendants' motion in
limine to exclude evidence of economic damages is granted in part
and denied in part (Doc. 66).  In making that ruling, the Court
makes the following findings as to the defendants' motion in
limine:

> - the applicable law allows for an award of lost wages in
> these circumstances;
>
> - if and when the occasion arises that Mr. Lane receives
> payment for lost wages under Ohio law, the federal law
> award will need to be offset in order to avoid double
> recovery;
>
> - neither <u>res judicata</u> nor the <u>Rooker-Feldman</u> doctrine
> bar the claim for lost wages in this case;
>
> - an award of lost wages should be based on the salary
> that Mr. Lane received prior to the termination of his
> employment;
>
> - the lost wages award should not be reduced by the
> amount received in unemployment compensation benefits;
>
> - the lost wages award should be decreased based upon the
> compensation Mr. Lane earned following the deprivation of
> his rights;
>
> - Mr. Lane is not entitled to recover attorney's fees
> associated with the mandamus claim and the hearings
> before the Personnel Appeals Board; and
>
> - the Court will address costs, pre-judgment interest,
> and punitive damages once those issues are properly
> before it for resolution.

In addition, the defendants' "motion in limine concerning
additional pre-deprivation claim" is denied. (Doc. 71).  Because

this Court is unaware of anything in the procedural history of
this litigation which would foreclose Mr. Lane from offering the
additional claim for a violation of his procedural due process
rights based on the alleged charges of sexual harassment, this
Court will not rule as a matter of law that Mr. Lane is
prohibited from bringing such a claim.  Mr. Lane's motion for an
oral argument pursuant to Local Rule 7.1(b) or, in the
alternative, motion for leave to file a sur-reply is granted
(Doc. 76).  More specifically, the motion is granted to the
extent that Mr. Lane seeks leave to file a sur-reply, and the
arguments raised in the motion constitute his sur-reply and were
considered by this Court in ruling on the pending motions.


                              /s/ Terence P. Kemp
                              United States Magistrate Judge